# Supreme Court of Texas

No. 22-0843

Texas Tech University System and
Texas Tech University System Board of Regents,

*Petitioners*,

v.

Pureza "Didit" Martinez,

*Respondent*

On Petition for Review from the
Court of Appeals for the Seventh District of Texas

JUSTICE YOUNG, joined by Justice Boyd and Justice Busby, dissenting.

Mrs. Martinez claimed that the Texas Tech University Health Sciences Center terminated her employment due to age-based employment discrimination, so she sued. The Center—Martinez's direct employer—is an entity under the authority of the Texas Tech University System and its Board of Regents. The System and the Board are not Martinez's direct employers, but she also sued them for employment discrimination. Under Texas law, a plaintiff can sue such a third party as an "employer" by alleging that it exercised control over the employment action. The

System and the Board filed a plea to the jurisdiction that asserts sovereign immunity and requests dismissal of Martinez's claims with prejudice.

The Court rejects that request. I disagree with the Court's judgment for reasons that I will explain in detail, but I agree with the Court that Martinez can indeed sue the Board and the System as "employers." After all, if the law did not allow Martinez (or *anyone*) to sue the Board or the System as indirect "employers," it would be pointless to give Martinez leave to replead; we would just dismiss with prejudice, as petitioners ask. The distance between the Court's view and mine, therefore, is not necessarily great. But what divides us is still important, especially because the Court's new concept of the sufficiency of the pleadings will affect the entire legal system.

The Court sends Martinez back to try again. I cannot see why. Martinez has *already* alleged more than enough to state a claim, the lowest burden in litigation. Satisfying that low bar is all she must do for us to uphold the judgments of the able district court and the unanimous court of appeals panel. The Board and the System, after all, chose to file only "a jurisdictional plea [that] challenges the plaintiff's *pleadings*." *Ante* at 7 (emphasis added). They could have, but did not, file a plea to the jurisdiction that would have required Martinez to provide evidence of contested jurisdictional facts.

The Court concludes that, despite the liberal construction we must give pleadings, Martinez's allegations fail even to state a claim against the Board and the System. She must say more. But what else, exactly, must Martinez allege? Here is how the court of appeals interpreted her original petition:

2

> [T]he following picture [is] painted by Martinez's live pleading. The University System, through its Board of Regents, decided to rid the Center of older employees due to financial concerns relating to their impending retirement. They then directed [the president of the Health Sciences Center, who was also the chancellor of the System] to implement their policy. He did.

683 S.W.3d 111, 116 (Tex. App.—Amarillo 2022). I agree with the court of appeals. Frankly, I agree with everything in its well-reasoned opinion, but most importantly, I agree that Martinez's original petition "satisfies [the requirements of Texas law]; the System and Board purportedly 'controlled access to the plaintiff's employment opportunities and denied or interfered with that access based on unlawful criteria.'" *Id.* She has pleaded more than enough to make these points.

Indeed, if her clear, specific, and detailed allegations are insufficient *on their face*, then I have been wrong all these years about what it takes to frame a sufficient pleading. The Court could, I suppose, treat this case as a ticket good for one ride only (but why, then, did we grant review?). Otherwise, the problem is not one for Martinez alone— she will have plenty of company in the lower courts, the bar, and the public in wondering what the minimum pleading standard really is. So I must respectfully dissent.

## I

This case comes to us on a plea to the jurisdiction because the Board and the System are state entities whose sovereign immunity has been waived as to employment-discrimination claims. *See* Tex. Lab. Code § 21.002(8)(D). The Labor Code "waives immunity, but only when the plaintiff states a claim for conduct that actually violates the statute."

3

*Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). The statute says this: "An employer commits an unlawful employment practice if because of . . . age the employer . . . discharges an individual." Tex. Lab. Code § 21.051(1). "Generally, an employer commits an unlawful practice 'because of' an employee's age if the employee's age was 'a motivating factor' for the practice, 'even if other factors also motivated the practice.'" *Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020) (quoting Tex. Lab. Code § 21.125(a)); *see also* Tex. Lab. Code § 21.101 (plaintiff employee must be "40 years of age or older").

For the statute to apply to a defendant, that defendant must be an "employer." No one disputes that the Center is Martinez's "employer"—it is her *direct* employer. But what about the Board and the System? They can be her "employers," too. As this Court has explained, the Labor Code's use of "employer" extends beyond *direct* employers; instead, it "affords a claim to people who do not stand in a direct employment relationship with the defendant-employer." *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 146 (Tex. 1999).[1] In doing so, we embraced the federal

---

[1] As I will describe, Martinez sufficiently alleges a claim against the System as her *indirect* "employer" under *Rennels*. She could choose to allege that the System is her *direct* employer. She noted in her briefing (and the Court discussed at oral argument), for example, that she has received W-2 forms listing her employer as the System. Moreover, as she noted, "[t]he parties have not yet begun discovery. Discovery of Mrs. Martinez's employee records will answer important factual questions as to who her 'employers' actually were, and given her position as Chief of Staff to [the president of the Center and the chancellor of the System], whether she was an employee of [the Center, the] System, or both." But for purposes of today's case, and indeed because today's decision matters so much to future cases, I focus on why the allegations are already sufficient *at this stage* for the System to be an indirect employer.

4

approach from *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973).

Under that test, even if the System and the Board are not Martinez's direct employers, Martinez may still sue them as "employers" if she alleges as to each:

> (1) that the defendant is an employer within the statutory definition of the Act; (2) that some sort of employment relationship exists between the plaintiff and a third party; and (3) that the defendant controlled access to the plaintiff's employment opportunities and denied or interfered with that access based on unlawful criteria.

*Rennels*, 994 S.W.2d at 147 (citations omitted). Making such a showing, we said, gives a plaintiff "standing" to sue the third party as an employer. *Id.* It was a mistake to call it "standing," which relates to subject-matter jurisdiction—including when the defendant is not a governmental entity.[2] Rather, *Rennels* clarified that the anti-discrimination laws also reach defendants who are not direct employers.

---

[2] If it *really* involved "standing," then even private defendants could challenge the pleadings on jurisdictional grounds. In fairness, the Court called it "standing" because *Sibley* used that term. *See Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1341 (D.C. Cir. 1973). That usage came from an earlier era in which courts had not yet begun speaking with precision about the difference between "standing" and "merits." *Sibley* helpfully explains that its use of standing included those who have "an interest within the zone of those regulated by the statute or constitutional guarantee in question." *Id.* at 1341 n.4 (internal quotation marks omitted). The Supreme Court has clarified that the zone-of-interests test actually implicates the *merits*—does the statute give one a right to relief? *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 & n.4 (2014); *see also Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 774 (Tex. 2020) ("[W]e have been clear in this century that the question whether a plaintiff has established his right to go forward with [his] suit or satisfied the requisites of a particular statute pertains in reality to the right of the plaintiff to relief rather than to the [subject-matter] jurisdiction of the court to afford it." (alterations in original) (internal quotation marks omitted)).

5

Alleging facts that address the *Rennels* elements, in other words, means that a plaintiff has satisfied the statutory requirement of suing an "employer." Whether *Rennels* was right or wrong to define "employer" this way may be an interesting question—but that question is not before us. No one here challenges *Rennels*. Every party instead asks us to apply rather than modify or discard it. The System and the Board only contend that they are not "employers," either directly or under *Rennels*.

To address this contention, the Court rightly focuses on the third *Rennels* element—that the Board and the System "controlled access to [Martinez's] employment opportunities and denied or interfered with that access based on unlawful criteria." *Id.* The Board and the System assert that Martinez has not even *alleged* that they did so. The Court agrees with them. *Ante* at 11. I do not.[3]

Martinez's original petition contains both direct allegations of discrimination by the System and the Board and allegations raising a presumption of discrimination by them—*two* ways for her to prevail under the statute.[4] If the System and the Board are not her direct

---

[3] The Board and the System make other arguments, too. One is that they could not have discriminated because, under the "Regents' Rules," they do not have authority to interfere in employment decisions in the System's components. The Court correctly rejects this contention. *Ante* at 12 n.7. The Board also asserts, contrary to the statute's language, *see* Tex. Lab. Code § 21.002(8)(D), that it is not an "employer" at all; Martinez says that this is disputable, given that various employees report directly to the Board. If either argument had merit, we would not allow repleading.

[4] There are "two alternative methods of proof" for age-discrimination claims under § 21.051. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012). (Of course, at the pleading stage, "proof" is not—or at least should not be—required.) The first "involves proving discriminatory

6

employers, the same allegations assert "control" and "interference" to satisfy the third *Rennels* element. *See infra* Part II.A (discussing Martinez's allegations in greater detail).

Our liberal-construction standard of review bolsters this conclusion. The Court must "construe the pleadings liberally in favor of the plaintiffs." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). But as I read it, the Court construes Martinez's pleading strictly *against* her and mandates that she greatly exceed what our law requires of an original petition. The standard thus bears repeating: "We construe the plaintiff's pleadings liberally, taking all factual assertions as true, and look to the plaintiff's intent." *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012).[5]

## II

So how do Martinez and the Court fare in discharging their duties—Martinez to sufficiently allege that the Board and the System

intent via direct evidence of what the defendant did and said." *Id.* Under the second, "the plaintiff is entitled to a presumption of discrimination if she meets the 'minimal' initial burden of establishing a prima facie case of discrimination." *Id.* (discussing the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). A prima facie case exists if the plaintiff "was (1) a member of the protected class under the [Labor Code], (2) qualified for his or her employment position, (3) terminated by the employer, and (4) replaced by someone younger." *Id.* at 642.

[5] The Court notes that pleas to the jurisdiction can be similar to "special exceptions." *Ante* at 8 n.5. True enough. But what purpose does this observation serve? Petitioners do not ask us (and did not ask the lower courts) to treat their jurisdictional plea as a special exception. Their plea to the jurisdiction asked for dismissal with prejudice. No party before us mentions "special exceptions." Nowhere other than footnote 5 does the Court mention "special exceptions." If special exceptions are relevant to today's decision, I do not see how.

discriminated against her, and the Court in reviewing those allegations with proper deference at this stage of litigation?  I address them in turn.

**A**

To start with Martinez, here is some of what she alleged.  She was 72 when she was discharged as chief of staff.  Pl.'s Original Pet. ¶ 45.  "The Board of Regents asked Dr. Mitchell [the president of the Center and also the chancellor of the System] to reduce the average age of senior leadership at [the Center]."  *Id.* ¶ 49.  Dr. Mitchell sent an email (which Martinez also attached to her original petition) in which he observed that the Board was "quite interested" in succession planning at the System and the Center.  *Id.* ¶ 14 (quoting Ex. B, the email).  He reported that the average employee of the Center's senior leadership was 60 years old and 62% of employees were eligible for retirement.  *Id.*  Martinez was 12 years above the senior leadership's average age.  *Id.* ¶ 45.

"One month later, Dr. Mitchell was true to his word and carried out the Board of Regents' request to reduce the age of senior leadership by firing Mrs. Martinez."  *Id.* ¶ 15.  Dr. Mitchell, "while acting for [the Center] and the TTU System," *id.* ¶ 23, fired Martinez both in person and via email.  *Id.* ¶¶ 16, 18.  Dr. Mitchell did this "to appease the Board of Regents and lower the average age of [the Center's] President's Executive Council . . . by firing Mrs. Martinez and replacing her with a younger white male."  *Id.* ¶ 23.

Central to Martinez's theory is her allegation that there was "no justifiable reason" for firing her.  *Id.* ¶ 15.  She was told that she was fired for "'leaking' information from [Dr. Mitchell's] office," which she categorically denied (even offering to take a lie-detector test).  *Id.* ¶¶ 19–

8

20. She observed that she had "never been accused of this type of, or even similar, conduct." *Id.* ¶ 19. Martinez was, instead, "a faithful employee of more than eleven years." *Id.* ¶ 15. She had "repeatedly received glowing evaluations, and her employee records will show that she has never been disciplined or accused of any misconduct." *Id.* ¶ 13. She was set to receive a $15,000 merit-based salary increase. *Id.*

Martinez buttresses her assertion that there was "no justifiable reason" for her firing by adding that there is "no evidence that [she] acted improperly." *Id.* ¶ 21. She both alleges this and shows that the allegation is corroborated by a third-party source. The U.S. Equal Employment Opportunity Commission investigated Martinez's claims after learning about them from another older employee (*i.e.*, Martinez did not reach out to the EEOC but the other way around). *Id.* ¶ 28.

The EEOC and its investigation are prominent in Martinez's original petition, to which the EEOC's ultimate "determination letter" is attached. *See id.* ¶¶ 21, 29, 34 (citing Ex. E). The Court disparages the letter, but for no good reason (particularly at this stage). The Court says that the letter formally names only the Center as "Respondent" and does not make official "findings" as to the System or the Board. *Ante* at 16 n.9. So? That is not why the determination letter matters. What *is* relevant is that the letter provides a neutral, third-party summary of the events leading to Martinez's termination and supports her allegations. In its letter, the EEOC recounted this: "During the scope of our investigation, interviews were conducted with those individuals involved in the decision to terminate [Martinez], and *not one* could provide *any* evidence whatsoever that shows that [Martinez] was responsible for disclosing

9

confidential information as they claimed." Pl.'s Original Pet. ¶ 21 (emphasis added) (quoting Ex. E).

Martinez uses the letter because it corroborates—indeed, bolsters—her key allegation that she was fired for "no justifiable reason." At this stage of litigation, we must take her allegations as true. If the letter eliminates leaking information as the reason for her firing, then it becomes more likely that the *real* reason is what Martinez alleges: the Board's direction to thin the herd of its older members.

There is even more. The letter, for example, also refers to Dr. Mitchell acting in his capacity as "Chancellor" of the System and sending the email that describes the "Board of Regents" being concerned about employee elderliness. *Id.*, Ex. E. (I discuss this email in much greater length in Part II.B.1.) And as Martinez alleges, she was "one of the oldest employees" and "was the first to go," *id.* ¶ 49, but she was not the only one to go. The same EEOC determination documents at least one other older employee who was fired around the same time as Martinez:

> [O]n or about June 17, 2019, or five days after [Martinez] was advised of her termination, the [Center] also terminated an Executive Administrative Assistant (EAA) for the Office of the President who was 62 years of age at the time of her hire. That EAA was hired by [Martinez] and was terminated on the same date she reported to work. That EAA was also replaced by someone who is almost half her age.

*Id.*, Ex. E.[6] The EEOC determination separately observes that Martinez's replacement was "substantially younger." *Id.*

---

[6] At oral argument, Martinez's counsel said that at least two older employees were fired around the time that Martinez was, as shown in the record.

To be clear, Martinez does not need the EEOC letter to sufficiently plead *anything*. But treating the letter as nothing exemplifies how the Court construes Martinez's original petition strictly against her instead of liberally in her favor. Martinez's allegations are sufficient on their own, and the letter only bolsters what she says. True, her allegations may not withstand merits scrutiny, which has not yet commenced. But as to whether she has adequately *alleged* a claim against the Board and the System, I regard this case as pretty easy. She has.

**B**

The Court does not fare as well as Martinez in discharging its duty, which is to "liberally construe" Martinez's pleading and take her allegations as true, and to read her pleading in a way that reflects the intent that its text makes manifest. The Court finds her allegations insufficient, but I cannot see how. Martinez's pleading adequately alleges discrimination by the Board and the System—not just a presumptive claim,[7] but one that invokes their direct intent, too.

Assuming that the Board and the System are not her direct employers, the Court's obligation is to assess whether she has successfully alleged that they were her indirect employers under *Rennels*. That is, do her allegations permit the inference that, in the context of her termination, the Board and the System exercised control over and interfered with Martinez's employment? Martinez alleges exactly that—

---

[7] Martinez was 72 years old, a good employee, fired about a month after the Board and the System communicated about the elderly age of certain employees, and replaced with a younger employee. *Cf. Garcia*, 372 S.W.3d at 642 (recognizing presumptive discrimination where the plaintiff is at least 40 years old, qualified for the job, terminated, and replaced by someone younger).

yet the Court answers in the negative.

Martinez alleges that the System, acting at the Board's direction and via the System's chancellor, discharged Martinez (or orchestrated her discharge) because of her age. Put differently, Martinez's pleading gives no hint that the Center—her direct employer—would have discharged her *without* the Board's and the System's communications and their concerns about the comparative elderliness of senior leadership.

The Court acknowledges that the Board and the System have the statutory power and ability to control Martinez's employment. *Ante* at 11–12 (quoting and discussing Tex. Educ. Code §§ 109.001(a), (c), 109.002, 110.01–.02). Just as the defendant in *Rennels* "was permitted by contract to influence the plaintiff's employment status," *id.* at 12 (citing *Rennels*, 994 S.W.2d at 147), the Court acknowledges here that, under the Education Code, the Board (which acts for the System) has a "general right to 'direct[], manage[], and *control*' the Health Sciences Center" where Martinez was employed, *id.* at 13 (alterations in original) (emphasis added). The Court's two reasons why the statutory control is not enough under *Rennels* are mistaken.

First, the Court briefly casts doubt on the force of the Education Code provisions because they are "unpleaded." *Id.* at 11. Because *the statutes in the Education Code are unpleaded?* No one disputes the statutory power and control expressly vested in these entities. And in liberally construing Martinez's original petition, the Court can (if it *really* thinks it is necessary) take judicial notice of these provisions. The Court's subtle dig at Martinez and her able counsel for not "pleading" these statutes again shows how the Court strictly construes her original

12

petition against her. This basis for dismissal is more reminiscent of sixteenth-century England than twenty-first-century Texas. *See JDH Pac., Inc. v. Precision-Hayes Int'l, Inc.*, 659 S.W.3d 449, 450–51 & n.2 (Tex. 2022) (Young, J., concurring in denial of petition for review) (recounting how Sir Edward Coke won a case because his opponent's pleading mistakenly translated one word of a centuries-old statute).

Second, the Court says that the Education Code provisions provide only a "general right of control." *Ante* at 13. Indeed—the law gives the Board and the System that control, which satisfies the first step of *Rennels*. But the Court instead draws on two independent-contractor cases, *id.*, which the Board and the System do not cite in their briefing. I have no quarrel with those cases. As the Court puts it, they stand for the innocuous principle "that forbids imposing liability based *solely* on a general right of control over the work of an independent contractor." *Id.* (emphasis added). The ability to control is necessary but not sufficient under *Rennels*—and so it is necessary for Martinez to allege it, but it is not all she must allege and it is not all she does allege.

It is necessary for her to allege it because, under *Rennels*—the case everyone asks us to apply without modification—to be an "employer," a defendant must be someone in a "position of power and control" or "in a position to exert some control" with respect to the plaintiff's employment status. 994 S.W.2d at 147. All Martinez must do for this first *Rennels* step is to allege that the Board and the System are in such a position. She has done so—and the Education Code provisions conclusively establish it as a matter of law, too.

If the Court is saying that it is not enough to allege how a

13

defendant *could* affect employment status, I agree. So does Martinez. An allegation that a defendant *could* interfere with her employment must be linked with the allegation that the defendant *did* so. She can do this either via direct allegations of improper age-based termination or via indirect allegations that raise a presumption of such termination. *See supra* note 4. Martinez does both here.

Directly, she alleges that the Board's demand to lower the ages of the leadership in the Center led to her firing, which was effected by someone subject to the Board's direct control—the System's chancellor. Indirectly, she alleges that she was fired and replaced with a younger employee about a month after the undisputed email communication involving the System, the Board, and concerns about the advanced age of senior leadership. She need allege no more than this at *the pleading stage* to bring the Board and the System within *Rennels*.[8] I reiterate that whether she can *prove* her claim is an entirely different matter, and I express no view of how the case would come out once she is put to the test.

So how can the Court see it otherwise? Its opinion gives at least two reasons. First, the Court contests the value of the email—which Martinez attached to her original petition and which features prominently in the record and the parties' briefs—in which Dr. Mitchell

---

[8] The court of appeals held that Martinez's allegations were insufficient to sue Texas Tech University as an indirect employer—precisely because of the "absence of allegations describing how [the University] could, or did, exercise control over the Center in regard to her termination." 683 S.W.3d 111, 116 (Tex. App.—Amarillo 2022). This illustrates my point: A failure to include allegations of *both* steps under *Rennels*—first, that a defendant *could* affect employment, and second, that it *did* so—is when a pleading would veer into insufficiency. Even Martinez agrees that no such allegations were raised against the University. But as to the Board and the System, there is a surfeit.

14

describes the Board's age-related concerns. Second, the Court treats the judgment below as an "expansive reading of *Rennels*," *ante* at 13, which leads it to foresee a host of problems that I find illusory. Neither reason provides any basis to deem Martinez's allegations insufficient.

**1**

The Court's primary reason for regarding Martinez's allegations as jurisdictionally insufficient concerns its view of Dr. Mitchell's email. The Court contends that Martinez "expressly rests" her allegations of the Board's and the System's discrimination on the email, and "[n]o reasonable reading of the email supports an allegation that the Board controlled access to and interfered with Martinez's employment." *Ante* at 15–16. The Court should read the email liberally in Martinez's favor, not strictly against her—and it should recognize that the email is hardly the *only* basis for Martinez's allegations.

Martinez's intent—discerned from the text of her live pleading— is clearly to allege that the Board and the System independently discriminated against her by terminating her, or by having her terminated, because of her age. *See Heckman*, 369 S.W.3d at 150 (in liberally construing a plaintiff's pleadings, we "look to the plaintiff's intent"). She hardly "expressly rests" her entire case of discrimination on the email alone. The email is simply a piece of circumstantial evidence— perhaps among the few documents she had at this pre-discovery stage of litigation—that is probative of the Board's and the System's roles in terminating her. *See Burks v. Watson*, 48 Tex. 107, 115 (1877) ("An exhibit to the petition, therefore, may be said to be made in aid of or in elucidation of allegations . . . ."). Martinez no doubt included it because it

15

helps explain why she was fired. She alleges that there was no other valid reason, and the email links the Board and the System to her termination by documenting their concern about employee elderliness. She uses the email to help explain why her termination was age-based and why the Board and the System were involved.

True, the email does not *compel* this conclusion. It does not, by itself, *prove* her allegation that the "Board of Regents asked Dr. Mitchell to reduce the average age of senior leadership at [the Center]" (an allegation that, ironically enough, the Court would apparently accept as true if only Martinez had *not* included the email). But it is not Martinez's burden to *prove* anything without having the benefit of discovery. That Martinez *has* the email, and reads it consistently with her theory, does not increase her pleading standard. It is unlikely in any discrimination case (indeed, in many other kinds, too) that the plaintiff would have a "smoking gun" document directly revealing impropriety that could be appended to an original petition. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012) (recognizing "that motives are often more covert than overt, making direct evidence of forbidden animus hard to come by").

It would be a different story if the email *contradicted* Martinez's theory or was even inconsistent with it. *See Freiberg v. Magale*, 7 S.W. 684, 685–86 (Tex. 1888) ("Had it contradicted or been inconsistent with [the allegations], the exhibit, and not the pleading, would control."). If a pleading attaches a legal instrument that forms the basis of the plaintiff's claims, the instrument itself controls over an allegation about what the instrument says. For example, in a breach-of-contract case where the

16

plaintiff appends a written contract to a pleading and alleges that the contract obligated the defendant to pay $100, a court would not credit the allegation if the contract on its face obligates the defendant to pay $50.

Nothing like that exists here. The email is not the basis of her claims, nor does it contradict her claims—it is collateral to and consistent with them. Martinez alleges that there was no good reason to fire her, and the email helps explain why she nonetheless was fired.

The Court, however, gives the email an especially rosy reading—essentially the same one given by the Board and the System. According to the Court, the email states "only that the Board was interested in 'succession planning'—a best practice for any institution hoping to endure beyond the short-term." *Ante* at 16. The Court then liberally extols the virtues of succession planning. *Id.* at 16 n.8 (quoting various human-resources authorities praising the soundness of succession planning).

The Court notes that succession planning "does not *require* terminating anyone." *Id.* (emphasis added). True—but it *could* involve that step.[9] Like everything else, succession planning can be done properly and lawfully or improperly and unlawfully. It would be irresponsible not to plan for the future—but planning for the future by firing older workers without cause under the guise of, *or even because of*, "succession planning" is unlawful.

The Court's acclaim for succession planning as a general matter is surely sound, but it is far too early at this stage of litigation for the Court to resolve what *kind* of succession planning was happening here. We may

---

[9] Getting $1 million fast "does not require" robbing a bank—but it *could* happen that way.

17

not—at least not yet—accept as true the Board's and the System's benign "succession planning" theory and reject Martinez's alternative and darker "succession planning" theory. Her theory is that any "succession planning" was, at best, pretextual. The standard of review compels us to accept *Martinez's* theory—but the Court accepts petitioners' instead.

After all, even the Court acknowledges that "Dr. Mitchell's motivation" in firing Martinez may have been "'to appease the Board of Regents' by lowering the average age of his senior advisors." *Id.* at 17. Martinez and at least one other employee were terminated about a month after the "succession planning" email was circulated and then were replaced with younger employees. If—and of course I emphasize that it is a big "if" that will require proof once Martinez gets to that stage—Dr. Mitchell (the System's chancellor[10]) implemented the Board's plan to fire older workers without cause under the guise of, *or even because of*, "succession planning" directives, then their conduct was unlawful under the Labor Code.

Recall, also, that the email does not stand alone, but fits within Martinez's larger theory that she was fired due to her age, not for cause (something that the EEOC corroborated), and that Dr. Mitchell gave misleading reasons for her departure (such as telling Martinez's

---

[10] The Court questions whether we can attribute Dr. Mitchell's conduct to the System, given his "dual roles" as president of the Center and chancellor of the System. *Ante* at 14. Surely at this stage and under our standard of review we must. It is undisputed that Dr. Mitchell was the System's chancellor when Martinez was fired. She alleges that he acted in this capacity in orchestrating her discharge. The email suggests he was acting as chancellor (at least partially) because he references the System. Indeed, the EEOC determination letter states that Dr. Mitchell sent the email as the "Chancellor." These debates should await the next step—perhaps an evidence-based plea to the jurisdiction.

colleagues that she left to care for an infirm husband). In this context, Martinez argues, the email helps explain what would otherwise (if we accept the truth of her allegations) be unexplainable. *See also Garcia*, 372 S.W.3d at 634 ("The prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." (internal quotation marks omitted)). That is, if no *other* reason for her termination holds up, it is reasonable to infer that the email, while not a smoking gun, implicates the real motive: edging out older employees.

\* \* \*

The Court may prove correct that, in truth, the email *was* innocent all along—that it never reflected more than ordinary business concerns. Even so, it is too early to give petitioners the benefit of the doubt. When assessing a non-evidentiary plea to the jurisdiction, I see no precedent in our cases allowing a court to speculate about extra-record materials—such as explaining away the email and then wiping away all the other allegations.[11] I cannot agree with the Court that Martinez has not alleged

---

[11] I cannot help but think that the Court's scrutiny of the email obscures the role that evidence should play in withstanding a non-evidentiary plea to the jurisdiction. The word "evidence" appears throughout the Court's opinion. The Court says we lack "subject-matter jurisdiction over the dispute absent some *evidence* the [defendant] violated Chapter 21." *Ante* at 7 (alteration in original) (emphasis added) (internal quotation marks omitted); *see also id.* at 9–10, 12, 14 (discussing "evidence").

This is wrong and the Court should repudiate it. Only later—in an evidentiary plea to the jurisdiction, at summary judgment (which was the posture in *Rennels*), and at trial—will Martinez be obligated to proffer "evidence" establishing control and interference. But Martinez needs no "evidence" to

19

what she needed to—and indeed far more.

Agreeing that Martinez stated a claim in no way predicts how the claim will fare once it is probed. It just means it is time to put Martinez to the test—which is what she claims she wants. If her allegations turn out to be fluff, then they will collapse like a house of cards. If limited discovery provides no basis to tag the Board or the System, they will be out. But today's decision is so inconsistent with notice pleading that it will affect far more than this single case.

## 2

Second, the Court worries that "[t]he court of appeals' expansive reading of *Rennels*" (the court of appeals did not expand *Rennels*) "would essentially make every parent corporation liable under Chapter 21 for the employment actions of a subsidiary or affiliated entity governed by the parent." *Ante* at 13.

I do not understand this corporate-liability concern at all.[12] It may

---

withstand a non-evidentiary plea to the jurisdiction. The Court's scrutiny of the email will surely scare future plaintiffs from attaching exhibits to their pleadings, not just in discrimination cases, but in *any* civil case.

[12] In fact, the Court's focus on "liability" misses the mark—unless the Court *is* trying to change rather than apply *Rennels*. The Court continually smuggles "liability" into this pleadings-standards case. The Court even asserts that "[t]he key question in this case is whether Martinez alleges sufficient facts to demonstrate that the TTU System and the Board can be *liable* to Martinez as an 'employer' under Chapter 21." *Ante* at 8 (emphasis added). The italicized word, which recurs throughout the opinion, reflects an undue focus on the merits at this most preliminary of stages. In any event, "[i]mmunity *from liability* does not affect a court's jurisdiction to hear a case." *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999) (emphasis added). Such immunity "is an affirmative defense that *cannot be raised by a plea to the jurisdiction.*" *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009) (emphasis added). As the Court observes, the System and the Board raised their non-employer status by way of

---

be true as an empirical matter that *Rennels* applies more often when the non-direct-employer defendant is a parent corporation of the direct employer (because who else would care about some other corporation's employees?). But *Rennels* is hardly confined to the corporate-family context. *Rennels* itself did not involve a parent corporation. Under *Rennels*, *anyone*—a parent corporation or someone else—who has the requisite ability to affect employment and who uses that ability is an "employer." That principle, which just defines who is an "employer" under the statute, is the whole point of *Rennels*. There is nothing new or surprising in it.

So I wholly agree with the Court's quotations about respecting corporate formalities, but I find them irrelevant. I agree, for example, that corporations are not "liable for each other's obligations *merely because* of centralized control, mutual purposes, and shared finances." *Id.* at 14 (emphasis added) (internal quotation marks omitted). But Martinez does not try to hold the Board and the System liable "merely because" of their authority over the Center. She claims that they *directly* acted against her. Likewise, everyone agrees that "[t]here must be *something more* than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the *alter ego* of the parent and make the parent liable for the subsidiary's tort." *Id.* (first emphasis added) (internal quotation marks omitted). Martinez alleges "something

---

an "affirmative defense." *Ante* at 5.

I do not think that the Court intends to *sub silentio* overrule the principles from *Jones* and *Lueck* stated above. What I think the Court's "key question" means is that *if* Martinez has not adequately alleged a claim, *then* she cannot further pursue liability. I agree with the logic but not the conclusion, because she *has* adequately alleged a claim.

21

more"—she does not treat the Center as the alter ego of the Board or the System. She seeks to hold them liable for their *own* acts, not merely some "subsidiary's tort."

Affirming the judgment below, in other words, would leave the law exactly as we found it. That decision creates no new litigation peril. Someone who does not allege that a third party could and did interfere with her employment will not benefit from *Rennels* even at the pleading stage. Someone who *does* make such an allegation will lose any benefit from *Rennels* if she cannot identify any evidence to support the claim that a parent corporation *or anyone else* could and did achieve unlawful employment discrimination.

Said differently, what are we to take from today's decision and its focus on anodyne principles of corporate liability? Does the Court mean to suggest that a parent entity that has undoubted power to control a subsidiary *and* is alleged to have exercised it should escape *on the pleadings?* If so, then today's decision is a massive change to our law that could only reflect dislike of *Rennels*. If that dislike motivates today's decision, we should confront *Rennels* head on—in a case where someone asks us to. The Board and the System only claim that Martinez's allegations do not satisfy *Rennels*. They do not ask us to demand more than *Rennels* requires. Nobody here asks us to overrule or even modify that precedent. No one has asked us (at least openly) to require more than allegations when a defendant only challenges the sufficiency of the allegations.

### III

I end where I began—wondering what else Martinez is supposed

22

to do when she repleads. The Court says she "falls just short of the mark," but the Court does not pinpoint what is missing. *Ante* at 19. The Court instructs her to "allege facts regarding *both* the exercise of control and interference with Martinez's employment *by each* of the TTU System and the Board." *Id.* She has already done this, both by alleging petitioners' direct control and interference and by alleging facts permitting a presumption of that conduct. The Court provides no examples of the sort of facts she would be able to plead in good faith on remand without having the benefit of discovery.

Speaking of discovery, I find it important to emphasize that *Rennels* and the other cases the Court cites arose in a more mature posture with the benefit of discovery. *Rennels* itself, for example, was a summary-judgment case where "evidence" obtained through discovery was needed. The Court's disposition today, however, does not guarantee Martinez any discovery, even as it imposes a higher standard at this first stage than *Rennels* did at the summary-judgment stage. The Court today simply instructs Martinez to take another shot. But then the Board and the System can file yet another pleadings-only challenge, which would keep delaying this case's resolution until the appellate process divines whether her new allegations are sufficient. "[T]he practical result" of sending back a case that is already so populated with allegations "well might be to establish a merry-go-round of litigation upon the issue, which could be used to defer indefinitely consideration of the merits." *United States v. Nat'l City Lines*, 334 U.S. 573, 591–92 (1948).[13]

---

[13] Suppose, moreover, that her renewed allegations are again deemed insufficient on their face—but that discovery against the Center (which cannot

It would be better to affirm the judgment below, which just means that the Board and the System can file a *different* kind of plea to the jurisdiction—one that challenges the existence of jurisdictional facts. If they do so, they will instantly put Martinez to the test, where mere allegations will no longer be sufficient. I recognize that the Board and the System do not relish discovery. I agree that discovery is sometimes abused. But *jurisdictional* discovery in particular can and should be limited to nothing but the challenged jurisdictional facts. The trial court need not and must not allow full-scale discovery:

> Discovery that implicates only the merits is wholly improper until it is clear that the court has authority to reach the merits. . . .
>
>     . . . .
>
>     . . . [I]f an adverse party . . . seeks to leverage permissible *jurisdictional* discovery into clearly impermissible *merits* discovery, the other side (in this case, the State) may seek a protective order, resist a motion to compel, or take similar steps. A trial court who issued an order in good faith only to determine its own jurisdiction would not permit that order to be abused. If it does, the appellate courts can and should appropriately limit discovery.

*Tex. S. Univ. v. Young*, 682 S.W.3d 886, 888, 890 (Tex. 2023) (Young, J.,

---

yet proceed because of this interlocutory appeal) eventually reveals that the Board and the System were the central parties responsible for her discharge all along. That result may seem unlikely, but if it were to happen, the statute of limitations might well prevent her from pleading the Board and the System back into the case, even though it would mean that her pleading was accurate from the start. *See* Tex. Lab. Code § 21.256 (two-year limitations period); *Levinson Alcoser Assocs., L.P. v. El Pistolón II, Ltd.*, 670 S.W.3d 622, 631 (Tex. 2023) (agreeing "that the running of a limitations period is not tolled when a suit is dismissed and refiled because a dismissal is equivalent to a suit never having been filed" (internal quotation marks omitted)).

concurring in denial of petitions).

Thus, the trial court's "broad discretion to allow 'reasonable opportunity for targeted discovery,'" *Garcia*, 372 S.W.3d at 643 (quoting *Miranda*, 133 S.W.3d at 233), does not mean *unlimited* discovery. Properly targeted discovery might reveal improper motives underlying Martinez's discharge, to which Martinez may not yet be privy. Or it might confirm that the succession planning was wholly innocent and premised on the idea that the Board and the System hoped that Martinez would stay on the job forever. Maybe it would reveal nothing at all, in which case the Board and the System could more properly seek dismissal.

Any other options that avoid targeted discovery exceed the scope of this appeal. The legislature could, of course, change the law. It could abrogate *Rennels*, which was, after all, only a statutory-construction case. Or it could expand existing exceptions to the anti-discrimination laws. For example, the Labor Code provides no claim for plaintiffs who are "executive or high policy-making position" employees, "at least 65 years of age," and subjected to "compulsory retirement." *See* Tex. Lab. Code § 21.103. (The Board and the System have not invoked this statute, so I assume without deciding that it does not apply.) The legislature could amend this law or create a new one that enables high-ranking officials like Dr. Mitchell to terminate their chiefs of staff—someone in whom personal confidence is essential—without having to defend against claims of age discrimination.

It is also possible that, in a case where someone asks, this Court could reconsider *Rennels* or examine whether the law in fact reaches high-level employees like Martinez. Such a rule, of course, would end a

25

case like this one not only against the Board and the System but also the Center. At this moment, there is no dispute that the law covers Martinez—and I cannot see a *legitimate* dispute about whether she has sufficiently alleged the facts that undergird her claim.

* * *

My concern is for other cases, not just this one, because I think today's decision destabilizes the concept of notice pleading. "Our notice-pleading rules require pleadings to not only give notice of the claim and the relief sought but also of the essential factual allegations." *Kinder Morgan SACROC, LP v. Scurry County*, 622 S.W.3d 835, 849 (Tex. 2021) (internal quotation marks omitted). Saying she is "just short of the mark" does not tell her *or anyone else* what the new pleading standard in Texas is. I believe, however, that Martinez already has pleaded the essential factual allegations necessary to withstand a pleadings-only jurisdictional challenge. Accordingly, I would affirm the court of appeals' judgment so that this case may proceed and come to a resolution, whatever that resolution may be. Because the Court does not, I respectfully dissent.

Evan A. Young
Justice

**OPINION FILED:** June 14, 2024

26